UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------X

ALICIA NICHOLLS,

Plaintiff,

-against-

THE BROOKDALE UNIVERSITY
HOSPITAL AND MEDICAL CENTER,
DAVID ROSEN, LEWIS MARSHALL,
and CATHERINE LIND,

Defendants.

------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ JUN 3 0 2005 ★

BROOKLYN OFFICE

MEMORANDUM,
JUDGMENT & ORDER
03-CV-6233

APPEARANCES:

For the Plaintiff:

Stewart Law Firm
133-40 Hook Creek Blvd.
Rosedale, New York 11422
By:     Nadira Stewart
        Charmaine Stewart

For the Defendants:

Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, New York 10017
By:     Celena Mayo
        Lori Adelson
        Jennifer Yasko

Jack B. Weinstein, Senior United States District Judge:

## Table of Contents

I.      Introduction..................................................................................................................3
II.     Facts............................................................................................................................4
        A. Background...........................................................................................................4
                1. Catherine Lind's Alleged Discriminatory Hiring Practices................................5
                2. Self-Scheduling................................................................................................13



       3.  Hiring of N.P.'s..................................................................................13
   B.  Plaintiff's Service as a Union Representative.................................................15
   C.  Hostile Work Environment.......................................................................19
   D.  Termination.........................................................................................24
III.   Law.....................................................................................................31
   A.  Summary Judgment...............................................................................31
   B.  Statutes of Limitations...........................................................................32
       1.  Title VII Claims.............................................................................32
          a.  Discrete Discriminatory Acts.......................................................32
          b.  Continuing Violation.................................................................33
       2.  Section 1981 Claims........................................................................34
       3.  State and Municipal Claims................................................................35
       4.  Defamation Claims..........................................................................35
   C.  Merits................................................................................................35
       1.  Title VII Claims.............................................................................35
          a.  Disparate Treatment..................................................................35
          b.  Termination............................................................................38
          c.  Retaliation.............................................................................39
          d.  Hostile Work Environment..........................................................40
       2.  Section 1981 Claims........................................................................42
       3.  State and Municipal Claims................................................................43
       4.  Defamation Claims..........................................................................43
       5.  *Patterson v. City of Oneida*.............................................................46
IV.  Application of Law to Facts...........................................................................47
   A.  Statutes of Limitations...........................................................................47
       1.  Title VII Claims.............................................................................47
       2.  Section 1981 Claims........................................................................48
       3.  State and Municipal Claims................................................................48
       4.  Defamation Claims..........................................................................48
   B.  Merits................................................................................................49
       1.  Title VII Claims.............................................................................49
          a.  Disparate Treatment..................................................................49
             (i)   Scheduling.................................................................. 54
             (ii)  Termination................................................................. 57
          b.  Hostile Work Environment..........................................................61
          c.  Retaliation.............................................................................63
       2.  Section 1981, New York State, and New York City Claims...........................64
       3.  Defamation Claims..........................................................................64
   C.  Summary Rejection of Like Claim by Court of Appeals..................................67
V.  Conclusion..............................................................................................68

# I. Introduction

Plaintiff, a black female of West Indian descent, contends that while employed at Brookdale Hospital she was discriminated against and then ultimately terminated based on:

> [her] race, ethnicity, national origin and/or ancestry pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981 *et seq.*; the New York State Human Rights Laws, Exec. Law § 296; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* Plaintiff further claims under the laws of the State of New York for defamation.

Am. Compl. ¶ 2.

Defendants move for summary judgment on the grounds that the hospital did not discriminate against the plaintiff for impermissible reasons; that her termination was the result of her having knowingly falsified hospital records in a manner that gave the impression that patients' charts had been signed by supervising attending physicians – a violation of professional ethics and a threat to patient safety; and that she was not defamed.

The evidence is necessarily set out in some detail. It supports defendants' view that plaintiff was terminated because of a serious breach of professional standards and not for any actionable discrimination; that she was not subjected to a hostile work environment; and that her claim for defamation is without basis.

While plaintiff, a member of a much discriminated against class, is undoubtedly sensitive to slights that might reasonably be perceived by her as motivated by illegal animus, those named as defendants cannot legally be charged with causing her injury. The subjective and ambiguous nature of the claims and the difficulty in appreciating the subtle atmospherics of employment conditions require a full and sympathetic analysis of plaintiff's claims. As in many similar cases

in our court, while a crystal clear picture of the workplace environment is not possible, the court is comfortable with the conclusion that no legal claim can be proven. It should be noted that ample time and opportunity were provided for full discovery.

## II. Facts

A. Background

Plaintiff was hired by Brookdale Hospital as an Emergency Department physician's assistant ("P.A.") on December 4, 1993. Defs' Rule 56.1 Statement ¶ 2. The duties of such a P.A. include providing care to emergency department patients and ordering diagnostic testing under the supervision of an attending physician. Defs' Rule 56.1 Statement ¶ 4. P.A.'s are known as "physician extenders" ("P.E.'s"). The class of P.E.'s also includes nurse practitioners ("N.P.'s"), who have, in general, somewhat higher minimum qualifications than P.A.'s and are permitted to operate with more freedom from physician supervision.

When plaintiff was hired, the Emergency Department had no N.P.'s. Plaintiff claims that the introduction of N.P.'s into emergency room service in and after 2000 diluted the percentage of black P.E.'s since there was a smaller percentage of black N.P.'s than P.A.'s.

In May of 2000, defendant Catherine Lind was hired as Director of Emergency Services, a position she held until her resignation in March of 2004. Defs' Rule 56.1 Statement ¶ 5. An N.P. herself, Ms. Lind acted as the non-clinical supervisor of the Emergency Department P.E.'s. Defs' Rule 56.1 Statement ¶ 6.

Plaintiff alleges that Ms. Lind exceeded the scope of her authority in supervising the P.A.'s. *See, e.g.*, June 15, 2005 Hrg. Tr. at 18 ("According to the PA's, nurse practitioners are not authorized to supervise physician assistants. Because of the change in hierarchy, so to speak,

4

the physician assistants were a little bit confused as to what was going on in the department . . . ."). There is nothing in the record to support this conclusion, nor does it affect the merits of the case.

1. Catherine Lind's Alleged Discriminatory Hiring Practices

Ms. Lind's conduct is central to the case. Plaintiff alleges that Ms. Lind discriminated against black P.A.'s on the ground of race, ethnicity, national origin or ancestry. The basis of these claims rests largely on allegations that Ms. Lind's hiring and firing practices were discriminatory. *See, e.g.*, June 15, 2005 Hrg. Tr. at 18 ("[The P.A.'s] notice[d] that Ms. Lind started firing a lot of black West Indian physician assistants and that they were being replaced with white and non-black nurse practitioners as well as physician assistants."). Of the fourteen P.A.'s in the department at the time Ms. Lind became Director, defendants contend that over 50% were black: six were black West Indian, two were African American, and six were white American. Defs' Rule 56.1 Statement ¶ 8. While employed as the Director, from May 2000 to March 2004, according to defendants, Ms. Lind hired twelve Emergency Department P.A.'s, over 75% of whom were black: four were black West Indian, four were black African American, one was black English, one was white Hispanic, one was white American, and one was "East Indian." Defs' Rule 56.1 Statement ¶ 9.

Plaintiff has called into question the accuracy of these figures by way of unsupported anecdotal recollections. *See, e.g.*, Jean Allick Aff. ¶ 58 ("I have reviewed the document that was identified as Defendants' Exhibit D and notice that names of several Physician Assistants who worked in the Department are missing. I do not remember everyone who is missing from the list but I know that the list seems short and inaccurate. For example, Guy Kelly ("Mr. Kelly"), a

5

black West Indian, and Brenda Wallace-Levy ("Ms. Wallace"), [an] African American, were terminated by Brookdale Hospital but do not appear on the list. I also do not recognize some of the names, such as Scott Dewitt, and do not think that they work in the Department."). Barry Slater, whose deposition could not be obtained, submitted an affidavit through plaintiffs, stating:

> I have reviewed Def.'s Exhibit D and realize that [it] does not accurately name the P.A.s who worked in the Department. First, it is missing many people, including Fritz Lochard, a man; Brenda Wallace-Levy, a black West Indian woman; Mr. Vijayarashavan; Mr. Rosenburg[;] Guy Kelly, a black West Indian male; Dustaft Persuad [sic]; Marianne Laguerre, a black woman; Dusedi, a black Guyanese; and Diane Stec, a white woman. Many of the black people who are missing from the list were terminated by Ms. Lind or quit due to the work conditions in the Department. This includes Mr. Lochard, Ms. Laguerre, Mr. Kelly, Dusedi, Ms. Wallace-Levy, D. Persaud, and R. Vijayarashavan.

Barry Slater Aff. ¶ 46. His conclusory statements are not supported by the hospital's records and cannot be given much weight. Attempts by the court to obtain more precise figures at the hearing on defendants' motion for summary judgment proved futile. *See* June 15, 2005 Hrg. Tr. at 23-32. Nevertheless, for purposes of summary judgment, all of the individuals identified by the plaintiff and her contentions about changes in department demographics are considered by the court in a way favoring plaintiff's contentions.

The lack of precision in plaintiff's contentions is suggested by the following colloquy:

> MS. C. STEWART [Counsel for plaintiff]: [We are] relying on the schedules that were produced by [plaintiff in a related case] and we'd ask[ed] for them to be produced by – we don't really know who and how many people are employed in Brookdale as physician extenders, we never got anything from defendants. They keep saying –
> THE COURT: Well, did you –
> MS. C. STEWART: We requested it, yes.
> THE COURT: Did you use discovery to attempt to find it?

MS. C. STEWART: Yes, Your Honor, and they didn't provide it.

THE COURT: Did you complain to the magistrate judge?

MS. C. STEWART: Yes, we did.

THE COURT: And what did the magistrate judge say?

MS. N. STEWART: She said that she didn't see the relevancy.

THE COURT: Did you appeal the magistrate judge's decision to this court?

MS. N. STEWART: Well, at the time period they said there was no relevancy [and] we didn't believe that the statistics were going to become an issue. It was in their summary judgment papers that they made a big issue of statistics.

THE COURT: Well, obviously statistics is a big issue in this case. It is the gravamen of your charge that they were discriminating against black West Indians by replacing them with other ethnic groups and I don't see anything in the record supporting your position that that was what was happening. Even as to the nurse practitioners, what was the ethnic background?

MS. N. STEWART: They were white. Ms. Lind hired –

THE COURT: All were white?

MS. N. STEWART: No, there were also black people who were hired in the time period. Barry Slater said that he hired Rosamond Payne, Rosemary White and Ronald Dinkwell.

THE COURT: Slater was doing the hiring?

MS. N. STEWART: Yes, Slater.

[There is no evidence in the record – apart from Mr. Slater's own conclusory allegations – that he had hiring authority.]

THE COURT: Slater, what was his ethnic background?

MS. N. STEWART: He was West Indian as well.

THE COURT: Why do you think that Slater was discriminating against West Indians?

MS. N. STEWART: We don't believe that Slater was.

THE COURT: Who was discriminating against West Indians?

MS. N. STEWART: Catherine Norton-Lind.

THE COURT: By hiring nurse practitioners?

MS. N. STEWART: No, not by . . . merely hiring nurse practitioners, there's also an issue as to, first of all, what was the race[] of the people that she was hiring. As stated above, we don't have complete statistics.

THE COURT: What were the statistical ratios before she took office and at the time of the firing of this plaintiff?

MS. N. STEWART: Before she took office there were no nurse practitioners so there's no comparison.

THE COURT: And what was the physician assistants['] ethnic ratio?

MS. N. STEWART: They were mostly black West Indian.

THE COURT: Mostly doesn't help me. What is the statistic?

MS. N. STEWART: I think they had about 16 physician assistants in total, about four of them were white.

THE COURT: About?

MS. N. STEWART: About, we never got a list of – a complete list of everybody.

THE COURT: Okay. Well, accepting that that's the best you can tell me now.

MS. N. STEWART: Right.

THE COURT: Four out of 16.

MS. N. STEWART: Right.

THE COURT: So, one in four was white.

MS. N. STEWART: Yes.

THE COURT: What was the situation after the nurse practitioners were hired?

MS. N. STEWART: Samatha Bell was hired, she's white.

THE COURT: The total of physician extenders which includes both categories?

MS. N. STEWART: We have at least 12 white physician extenders hired during the time period.

THE COURT: I'm not asking you how many were hired, I'm asking you what the ratio was when your plaintiff was fired of whites to West Indians, blacks.

MS. N. STEWART: The problem is that a lot of the NP's who came in, they didn't stay. They came and they found the environment very disruptive and they left.

THE COURT: I understand the problem, that's why I can't accept your statement about hires. I want to know what the ratios were of those actually on duty.

MS. C. STEWART [counsel for plaintiff]: Your Honor, we're just using our client's statements.

THE COURT: I don't care for your client's general impressions, I need to have –

MS. C. STEWART: Statistics.

THE COURT: I need facts. You're claiming discrimination.

MS. C. STEWART: Yes, Your Honor.

8

THE COURT: I don't see the material in your papers supporting the claim and I'm asking you now a very specific question, what was the ratio of West Indians to whites before this woman you say is discriminating or was discriminating and what was it at the time your client was fired? It's a simple question[;] it comes up in all these cases or most of them.

MS. C. STEWART: We would say about, based on what we have about 65/35.

THE COURT: 65 percent West Indian?

MS. C. STEWART: Yes, 35 – and the reason we're saying that is that defendants cannot rely on the fact that they haven't provided their statistics but it is more between 30 and 40 but it increased.

MS. N. STEWART: The statistics they gave us still though it is mostly Black West Indians.

MS. C. STEWART: It was always mostly black West Indians.

THE COURT: Before and after?

MS. C. STEWART: Before and after except after the hire there were about 35 percent white. Then the people subsequently left the employment, so it was increasing until they started leaving.

THE COURT: So, you don't know what the ratio is at the time your client was fired?

MS. C. STEWART: Based on what she says, about 35 percent.

THE COURT: What she says?

MS. C. STEWART: Yes.

THE COURT: That's of all physician extenders, right?

MS. C. STEWART: Yes.

THE COURT: Now, as far as physician assistants, what was the ratio before this change was made and the ratio when she was fired?

MS. C. STEWART: It was about – before Cathy Lind it was more than 90 percent.

THE COURT: And when your client was fired what was the physician assistant ratio?

MS. C. STEWART: About 60 percent.

THE COURT: Physician assistant?

MS. C. STEWART: Uh-huh, because they brought in the NP's afterwards.

THE COURT: You keep responding in a way that doesn't help me.

MS. C. STEWART: I'm trying to understand.

THE COURT: There are three categories – excuse me, listen to me, because I'm the one you have to convince.

MS. C. STEWART: Yes.

THE COURT: As I understand it, there are three categories we're dealing with.

MS. C. STEWART: Okay, maybe I'm misunderstanding it.

THE COURT: Physician extenders which includes two subcategories[:] physician assistants, which is a subcategory of a physician extender, and nurse practitioners, which is a subcategory of physician extender. Now, I want to know as to all three of those categories, the main category and the two subcategories, what was the ratio of black West Indians at the time this woman you claim began the discrimination, correct?

MS. C. STEWART: That's correct.

THE COURT: There was no discrimination before, correct?

MS. C. STEWART: No.

THE COURT: She began the discrimination, what was the ratio when she came in and what was the ratio in all three categories when your client was fired?

MS. C. STEWART: Okay, when she came in, there were no NP's, so, and there were more West Indian, 90 percent were black West Indians.

THE COURT: Okay, so, 90 percent, therefore, of the physician extenders were West Indian because there were no nurse practitioners, right?

MS. C. STEWART: That's correct and I'm using approximations because I haven't done the math.

THE COURT: Okay. Now, at the time your client was fired, what was the ratio of physician assistants?

MS. C. STEWART: The ratio was actually substantially – it was like they brought in about 12 NP's.

THE COURT: Excuse me, why don't you just answer my question.

MS. C. STEWART: Okay, about 55/45.

THE COURT: 55, it had decreased to 55 percent West Indians in the physician assistants.

MS. C. STEWART: Oh, that's the question. I thought you asked –

THE COURT: Excuse me, listen to my question please and try to answer it precisely. When your client was fired, among the physician assistant category, how many were West Indian?

MS. C. STEWART: About 65.

THE COURT: It had dropped from 90 to 65?

MS. C. STEWART: That's correct.

THE COURT: And the other 35 percent were what ethnic group?

MS. C. STEWART: Others, white and others.

THE COURT: What were the others?

MS. C. STEWART: Asian and –

MS. N. STEWART: There were a few East Indians and some other Asian groups. There's a person with the last name Li but we don't know what their first name is.

THE COURT: We can assume it is Asian. What was the category – how many Caucasians, white Caucasians were there when she was fired [among] the physician assistants?

MS. C. STEWART: I think about ten. I think about ten.

THE COURT: Out of how many?

MS. C. STEWART: 12 that were hired.

THE COURT: I'm not asking you about hired. I want to know how many were employed, actually employed at that time, please answer my question.

MS. C. STEWART: Okay.

MS. N. STEWART: According to defendant[s'] statement, there are about eight white PA's at the time period. I don't know if those were the same people who were present at the time plaintiff was fired. That's according to their statement which both Jean Allick and Barry Slater also say[] is inaccurate, that there are people missing off those lists.

THE COURT: So, you don't know what the answer is.

MS. N. STEWART: Exactly.

THE COURT: Now, as to the nurse practitioners.

MS. N. STEWART: As to the nurse practitioners.

THE COURT: What is the answer to the two time periods I've asked about?

. . . .

MS. C. STEWART: There were eight that I can recall that were white and four blacks and the four blacks were the ones that Mr. Slater claims he hired.

June 15, 2005 Hrg. Tr. at 23-32.

Having considered Barry Slater's affidavit to the extent reasonable, the court concludes that it was fatally unspecific in its identification of the race, ethnicity, and national origin of the

individuals allegedly omitted by the defendants in discovery. For purposes of the summary

judgment motion, the court will instead rely on plaintiff's statistical representations at oral

argument. According to plaintiff, before Ms. Lind began her employment, there were

approximately 16 physician assistants, four of whom were white. By plaintiff's own assessment,

25% of the P.A.'s were white and 75% were non-white. Counsel for the plaintiff later indicated

that 90% of the P.A.'s were West Indian; there is no basis in the record, nor in her own oral

argument (which she acknowledged was a rough estimate), for such a statistic. At oral argument,

plaintiff's counsel also indicated that the percentage of West Indian P.A.'s decreased to 65%.

Assuming that 75% of the P.A.'s were West Indian before Ms. Lind began with the hospital – the

most favorable statistic possible for the plaintiff – the difference in the percentage of West

Indians amounts to approximately 10%. That statistical difference raises no inference of

impermissible discrimination, particularly where the record is clear that the new hires – contrary

to plaintiff's allegations – were racially and ethnically diverse. *See* Defs' Exhibit D.

   The weakness of both Barry Slater's affidavit and plaintiff's representations at oral

argument lies in their vague and conclusory nature. Barry Slater's affidavit did not provide the

races of some individuals named, their start dates, or whether they were fired by Ms. Lind or

resigned voluntarily. Since Barry Slater was not deposed, his allegations could not be explored

in detail by either plaintiff's counsel or the defendants. The individuals listed by Barry Slater

were not deposed, and none provided affidavits confirming or denying his claims. Mr. Slater's

muddied affidavit does not substantially support the substance of plaintiff's claims. At oral

argument, the shifting and uncertain statistics provided by plaintiff's counsel provided little

guidance as to plaintiff's claims of discrimination. Rule 56(e) opposition arguments are not

aided by issues founded on unsubstantiated speculation.

2. Self-Scheduling

The voluminous documents submitted by both plaintiff and defendants establish the following narrative: While in her capacity as Director of Emergency Services, Ms. Lind implemented a system of "self-scheduling." According to that system, P.A.'s were asked to submit their preferences for work schedules, including dates and times that they wished to work, as well as vacations and holidays. As reflected in numerous agendas for meetings between the P.A.'s, physicians, and Ms. Lind, it appears that there was some dissatisfaction among the P.A.'s with this system. At times, scheduling preferences would conflict. Ms. Lind retained ultimate authority over the assignments of work schedules, including time off. The record suggests that not everyone approved of the manner in which Lind exercised this authority, but there is no evidence that illegal discrimination was the basis for any scheduling.

3. Hiring of N.P.'s

The most notable feature of Ms. Lind's tenure was that she began to increase the rate of hire of N.P.'s. Nurse practitioners, as previously suggested, undergo training different from P.A.'s. They are permitted to treat patients with less physician supervision than P.A.'s. According to plaintiff, there was a larger ratio of white individuals among the new N.P.'s than among the P.A.'s.

The hiring of N.P.'s was perceived with varying levels of approval by the P.A.'s. Cast in the light most favorable to the plaintiff, there is evidence suggesting that some of the P.A.'s were concerned with both the hiring of N.P.'s and the self-scheduling system; for some black or West Indian P.A.'s, these concerns may have included a racial component, given that a white

13

supervisor, who was herself a nurse practitioner, in their view, was hiring white employees who might rank above them in the employment hierarchy at Brookdale, and might be given preferential treatment in scheduling and other matters. *See, e.g.*, Barry Slater Aff. ¶ 36 ("[M]any P.A.s believed that Ms. Lind was purposefully hiring white N.P.'s (and residents) with the intent to replace the black P.A.s. I remember that we suddenly hired a lot of white Level 2 providers at the same time that we were suspending and firing many black Level 2 providers. . . . Most of the N.P.s that Ms. Lind hired were white. We believed that Ms. Lind actively sought to recruit white N.P.s because, based on my interviewing experience, many white N.P.s did not voluntarily look for employment in the Department. . . . *Upon information and belief*, during my employment in the Department, no white extender or nurse was terminated while Ms. Lind was Director of Emergency Services. In contrast, black extenders were regularly disciplined, suspended, and terminated. The P.A.s frequently complained that before Ms. Lind's employment, no P.A. had been fired from the Deparment. . . . Due to these disparities, the P.A.s protested the employment of the N.P.s because we believed that Ms. Lind wanted to replace us and discrimination was a factor. . . . The self-scheduling system did not work because the changes always were reflected on certain personnel and not others. The Lind self-scheduling system also did not take into account seniority and newer, white employees received preferential treatment in assignments. As a result, the P.A.s commonly complained about bias in the scheduling system . . . .") (emphasis added).

Any inference of racial discrimination in the decision to hire N.P.'s is belied by the record. Counsel for defendants at oral argument properly stated:

> [T]o the extent that plaintiff is claiming that the hospital

14

> was hiring nurse practitioners, white nurse practitioners to get rid of black West Indian physician assistants, that argument similarly fails. The undisputed evidence clearly shows that of 14 nurse practitioners who were hired by the department, ten of them were black and West Indian.

June 15, 2005 Hrg. Tr. at 11; *see also* Defendants' Exhibit K at 7. Barry Slater identified the

N.P.'s hired by race, ethnicity, ancestry and national origin, and in doing so, acknowledged that

the majority of N.P.'s hired were black West Indians:

> Ronald Dingwell Black/Trinidadian
> D. Jordan Black/Guyanese
> S. Bell White/American resigned
> S. Estes Black/Jamaican
> Wendy Smart Black/Trinidadian
> C. Fiorcelle White/American
> EW White/American
> Ann Luster White/American
> B N Black/Guyanese
> Claudette Jerome-Orniz Black/Haitian
> SG Black/Jamaican
> VG Black/Jamaican
> Rosemary White Black/Jamaican
> Rosalind Payne Black/Grenadian

Barry Slater Aff. ¶ 49.

## B. Plaintiff's Service as a Union Representative

In plaintiff's affidavit, she contended that the P.A.'s decided to unionize as a result of

concerns regarding self-scheduling and the hiring of N.P.'s. Pl. Aff. ¶ 25. At oral argument,

counsel for the plaintiff acknowledged that the P.A.'s unionized because of a change in hospital

management and its resulting *economic* impact. June 15, 2005 Hrg. Tr. at 17 ("In about 2000

Brookdale Hospital was taken over . . . at which point it came underneath the auspices of CEO

David Rosen . . . . There were a lot of economic disruptions at the time and, as a result, there

was an initial unionization movement with the physician assistants. Once they got the benefits they wanted, they basically lost interest in participating in the union.").

Plaintiff and Barry Slater served as union representatives. In that capacity, they were tasked with bringing complaints from the P.A.'s to management. The record is bereft of evidence that either plaintiff or Barry Slater brought claims of racial discrimination or sexual harassment. To the contrary, an affidavit submitted by the plaintiff sums up the concerns of the P.A.'s:

> When [Ms. Lind] joined the staff at Brookdale Hospital, there was renewed interest in unionizing.
>
> . . . .
>
> A big problem that caused complaints was the scheduling system under Ms. Lind's supervision.
>
> . . . .
>
> Ms. Lind was the Director of Emergency Services and approximately 12 Nurse Practitioners were hired and I remember four to be Caucasian. The Physician Assistants felt threatened by this because Ms. Lind was also a Nurse Practitioner and we (the Physician Assistants) felt that there was a possibility of Nurse Practitioners replacing Physician Assistants. *Race was never an issue for me.*

Jean Allick Aff. ¶¶ 40, 46, 56 (emphasis added).

Plaintiff contends, by contrast, that she raised concerns about race and gender discrimination on behalf of others in her capacity as a union representative:

> A. . . . Just walking in that place, knowing that you had made complaint after complaint after complaint and nothing was being done about it.
> Q. I just want to clarify. The complaints that you were making [were] about overtime, scheduling and pay issues and holiday time?
> A. Discrimination.
> Q. When did you complain about discrimination?
> A. To Butchalano.

16

Q. Who is that?

A. An administrator.

Q. When did you complain to Mr. Butchalano about discrimination?

A. In December of 2001.

Q. Did you bring a complaint on your own behalf or on someone else's?

A. I made mention to myself, I did also mention the fact that, since [Ms.] Lind came there, about the scheduling issue that I had in terms of being put on to work every holiday for that period.

Q. Is that what you complained . . . about?

A. Yes, and about some other stuff.

Q. What other stuff?

A. Just the way, how we were being treated, the way that you were being treated in the ER.

Q. I am sorry. Can you be more specific than that?

A. In terms of the issues that we had, were ongoing issues of money, overtime. Basically, what I am saying is, the exact conversation, I can't recall all of it, what I spoke to him for the PA's, I know there were some issues about time and money, and I know for myself, definitely, I walked in there because I had been placed on the schedule for Thanksgiving, Christmas and New Year's.

Q. Did you complain about discrimination at any other time, other than this one conversation . . .?

. . . .

A. We had explained to Ayala.

. . . .

Q. When you say complained about discrimination, what type of discrimination did you complain about?

A. We complained about how we were being treated in terms of the agreements that we had.

. . . .

A. . . . [We] complained about [Ms.] Lind discriminating against us.

Q. In what way did you complain that [Ms.] Lind was discriminating against you?

A. In terms of disciplinary measures and stuff like that.

. . . .

Q. Did you tell Dr. Butchalano that you were being discriminated against *because of your race and national origin?*

A. I am not sure about the exact terms. I know I said – I know I used the word discrimination. I am not sure about – about all of

the exact terms.

Q. Did you ever tell Rachel Ayala that you thought you were being discriminated against *because of your race and national origin?*

A. I don't recall that. I do recall having a conversation with her about discrimination. All of the terms, I don't recall.

Q. Did you ever tell *anyone* in the administration at Brookdale Hospital that you thought that you were being discriminated against *because of your race or national origin?*

A. Yes.

Q. Who?

A. The PA's, the doctors.

Q. I am sorry. Perhaps I need to clarify my question. Did you tell anyone *in the administration* at Brookdale Hospital that you thought that you were being discriminated against *because of your race and national origin?*

A. I don't recall specifically. What I do recall is that these are issues that were set up to be discussed at one of the meetings.

Q. Which meeting?

A. One of the Human Resources meetings.

Q. When?

A. The exact date, I can't recall. It is in the notes.

Q. In these notes that you're going to be producing to us?

A. No, in the notes that you already have.

. . . .

Q. Was this the document you were referring to? You said there was a meeting, you said it was scheduled to be discussed at a meeting and you had it in your notes which had been produced to us?

. . . .

Q. So, these aren't the minutes of the meeting that you're referring to?

A. No.

Q. Then, I will show you all of the documents that you produced to us, and I would like you to tell us what meeting it is that you're referring to?

. . . .

Q. You were referring to a meeting earlier? Are these the notes from that meeting?

A. Yes. This is part of – one of them. Meetings, we said; right?

Q. These are notes from one of those meetings?

A. Yes, these are notes that I do believe that were the agenda that we submitted. This one in particular, that we submitted with outstanding issues that we already discussed. This was going to be

> the scheduled agenda that we were going to talk about.
> Q. Can you tell me where on those agenda meetings it says where you were going to be discussing the issue of race and national origin discrimination?
> A. This one here (indicating).
> Q. Does that say that the issue of race and national origin discrimination is going to be discussed?
> A. *It does not specifically say that race and origin*, that is what we were going to discuss. It says we were going to discuss the harassment that we were receiving in the ER.
> . . . .
> Q. Can you tell me where there it says that you're going to be discussing the issue of race and/or national origin discrimination?
> A. This is earlier that year.
> Q. Have you answered the question?
> A. This is not the document I was referring to.

Pl. Depo. at 202-13 (emphasis added). The record contains no evidence that the plaintiff complained of gender or race discrimination to the administration. The Hospital indicates, without contradiction, that during the entire time plaintiff was at Brookdale, only two discrimination claims were presented to the administration – one based on pregnancy and the other on military status. *See, e.g.*, Brenda Lee Aff. at 37 ("There was one complaint about a military discrimination based on military status. And I think there was one regarding something – regarding a medical leave, pregnancy or something like that.").

The record reflects that Barry Slater, the other union representative, was fired. There is no indication of why. No evidence indicates that the termination was in retaliation for bringing claims of actionable discrimination.

C. Hostile Work Environment

In plaintiff's deposition, she summarized her hostile environment claims as follows:

> Q. Did anyone, did Kathy Lind, Lewis Marshall, Daniela Niec, or David Rosen, in the time that you worked at Brookdale Hospital,

19

ever say anything racially derogatory to you?

A. Kathy Lind. We were having -- we wanted to have like a PA day and I had approached her about it, and she made mention of -- I said, you know, we are thinking of ordering ethnic food and stuff like that, and then she had made some mention of, "We don't want that greasy food." But yet, I felt it was discriminatory, because when we had other meetings and they ordered pizza, I saw her eating the pizza, so I felt that was discriminatory.

Q. Anything else?

A. At this point, that I can recall, no.

. . . .

Q. Let's talk about your hostile work environment claim. Can you identify the incident which you believe made up a hostile work environment?

A. A hostile work environment?

Q. Yes.

A. It was the lack of supportive staff. A lot of us had concerns where we were placed in areas where we would have to like pick up the slack for a lot of other duties that we weren't assigned to . . . . A lot of us felt that since we had to take up the slack doing inpatient care, doing the stuff that other people were supposed to be assigned to, we were overworked.

Q. Is there anything else, is there any other basis . . . for your hostile work environment claim?

. . . .

A. Well, some of us felt that we were being subjected to hostile work environments because, if Kathy Lind wanted to discipline, [s]he would put us with certain practitioners who would make complaints, who, at the end of the day, she could get them to make complaints.

. . . .

Q. Anything else? Any other ways in which Kathy Lind made your work environment hostile?

. . . .

A. After she started handing out terminations and suspensions and stuff like that, there was no -- the protocol wasn't being followed. It derived some anger among the staff. We felt like we were being -- we had a contract with the hospital and we were being discriminated against and subjected to coming into an environment which really wasn't fit for us to work in, with limited staff, supplies missing, and suspensions handed out, terminations and stuff like that, without following the protocol. We felt it was very hostile to work there.

. . . .

Q. . . . Anything else that you feel made your work environment hostile?

A. Besides it being so obvious that the staff would pass by and they would say to you, you know, she is after you, you are going to be next, besides that?

Q. Did Kathy Lind walk by you and say she is after you, you are going to be next?

A. No.

Q. Did Lewis Marshall do that?

A. No.

Q. Did Daniela Niec do that, did Dr. Niec do that?

. . . .

A. I don't recall offhand, but – but, what I do recall is, Dr. Niec, there was a physician there, he was Hispanic, and Dr. Niec had made some very derogatory remarks to me about him.

Q. He was a doctor?

A. Yes, she had made mention about his – she called him a faggot and she made mention, saying, people like that shouldn't be allowed to work here. I had some other complaints from other P.A.'s, including Evelyn Mark, who she had referred to in broad daylight as a black bitch. I had some nurses of West Indian descent complain to me about things, derogatory things she had said to them. They made mention they had never heard her being derogatory to a white person.

Q. Did Daniela Niec ever say anything to you that was derogatory?

A. About myself, to me, personally?

Q. Yes.

A. I don't recall.

Q. You said she said something to you one time about a doctor?

A. Yes.

Q. How often did you work with Dr. Niec?

A. A lot.

Q. Anything else?

A. Huh?

Q. Anything else, about the hostile work environment?

A. I am thinking. It is long and difficult, I have to recall a lot of facts. . . .

Pl. Depo. at 191-202.

Viewed in the light most favorable to the plaintiff, one Eastern European female doctor

21

allegedly referred to a P.A. as a "black bitch" and called a Hispanic doctor a "faggot." Plaintiff

had no personal knowledge of the alleged racial slur nor did she proffer evidence by a person

having personal knowledge. In counsel's deposition of the doctor who allegedly made both

comments, no mention was made of either statement. Plaintiff did not bring the alleged slurs to

the attention of the administration:

> Q. In paragraph 53 you allege that Daniela Niec, Dr. Daniela Niec
> referred to physician assistants as black bitches; can you tell me
> when this incident occurred?
> A. This incident was related to a complaint from, from a physician
> assistant by the name of Evelyn Marc (phonetic).
> Q. Can you tell me when this incident occurred?
> A. Offhand I can't remember the exact date?
> Q. Okay. Was it before you were terminated?
> A. Yes.
> Q. Okay.
> A. I think so.
> Q. Six months about before you were terminated?
> A. Ms. Mayo, I cannot give an exact date. I know I had several
> complaints and this was one of the complaints that was given.
> Q. And what is it exactly that Miss Marc said to you occurred?
> A. She said that there was an incident, I know, it was, I don't think
> it was just her there at the time because I think – I think – I don't
> remember exactly what happened. But I remember there was some
> conversation about her being called a black bitch.
> Q. Okay. Now, you said that Evelyn Marc complained to you
> about this?
> A. Right.
> Q. What did you do with that complaint?
> A. What did I do with that complaint? I think that might have
> been – I might have mentioned it to the union because at the time,
> because of what was happening in the ER, because there were so
> many complaints about stuff that was happening and nothing was
> being done, I did not think that the ER was the route to go through.
> I think I forwarded that to the union.
> Q. Did you write this down, did you write a letter to the union?
> A. No. I took the complaint. I – the writing was left up to the
> delegates and stuff. I didn't forward it in writing. Maybe she did,
> but I don't. I didn't personally.

Q. But you were not present when [the incident alleged in paragraph 53] occurred, is that right?

. . . .

A. I don't think so. I don't think I was there. I was there for other stuff but not that. I don't recall.

Q. What other stuff were you present for?

A. Little derogatory comments she made.

Q. That Dr. Niec made?

A. Yes.

Q. Such as?

A. About not wanting to work with [Evelyn Mark].

. . . .

Q. Can you elaborate on that?

A. She was very verbal and she would walk around and a lot of people heard her when she was dropping comments.

Q. What did she say?

A. The one particular incident that I think I recall is the, I think it was she called her blimp or something, Good Year blimp.

Q. Anything else?

A. That I was present, present for?

Q. Yes.

A. I don't recall.

Pl. Depo. at 235-38.

Plaintiff also contends that Ms. Lind said she had "an 18-month plan to get rid of all of you," and that she understood Ms. Lind to be referring to the black P.A.'s. Assuming for purposes of summary judgment that Ms. Lind did make such a statement, there is no basis in the record to assume that Lind's reference was to black or West Indian P.A.'s. Ms. Lind hired nine black P.A.'s, including four of West Indian descent, during her tenure as Director. Defendants' Exhibit D. Given that Ms. Lind hired twelve Emergency Department P.A.'s, nearly doubling the number of P.A.'s by increasing it from fourteen to twenty-six, an assumption that she wanted to get rid of P.A.'s as a class because it contained too many black or West Indian members is also unsupported by the record.

23

D. Termination

Plaintiff was ultimately terminated from her employment with Brookdale Hospital. She contends that she was fired based on impermissible factors such as her race, ethnicity, ancestry and national origin. The defense is that she was terminated for violating a hospital policy for which termination, and not a less harsh punishment, was the appropriate sanction.

Some clarification of the relationship between P.A.'s and their supervising physicians is necessary to understand both defendants' and plaintiff's versions of relevant events. On a typical shift, according to both plaintiff and defendants, a physician assistant sees patients either with or without a supervising physician actually present. Evidence suggests that the degree of physician supervision varies according to the level of trust a physician has in a particular P.A. While a physician takes ultimate responsibility for the patient, assuming that he or she has confidence in the work of a P.A., the physician may not see every patient that a P.A. has seen. Rather, a P.A. will "present" the patient's record to the supervising physician, who reviews it, and if he or she concurs with the P.A.'s evaluation and recommendations, will co-sign the document. Co-signature is required to establish that the physician has in fact supervised the P.A. in accordance with state law. A physician need not co-sign before the patient is discharged, and it appears that, however disfavored the practice, physicians at times sign files long after the treatment provided by the P.A.

Plaintiff does not dispute that the medical record used by Brookdale in its Emergency Department includes separate and distinct blocks for: (1) the physician's name to be printed; (2) the physician's name to be signed; and (3) the physician's health care provider number. Three separate blocks, on the opposite side of the page, are labeled for: (1) the P.A.'s name to be

24

printed; (2) the P.A.'s name to be signed; and (3) the P.A.'s provider number.

At issue in the instant litigation is the shift that took place from 7:00 p.m. to 7:00 a.m. on August 28, 2002 and August 29, 2002. There is no dispute that during the shift plaintiff was under the direct supervision of Dr. Michael Epter. Plaintiff's version of events differs from Dr. Epter's in significant respects.

According to Dr. Epter's deposition testimony, the substance of which defendants appear to have adopted in terminating plaintiff, at the beginning of the shift he discussed what he expected of the plaintiff during the course of the evening. He explained that this conference was due to his lack of experience with plaintiff. In her deposition, plaintiff acknowledged the limited nature of her relationship with Dr. Epter. Pl. Depo. at 254 ("Dr. Epter, I barely knew him . . . ."). Because he had not worked in a substantial way with her prior to that evening, Dr. Epter states that he decided that close scrutiny of plaintiff's work was required. According to Dr. Epter, he specifically told the plaintiff that she should present each case to him prior to discharge:

> A. . . . If you don't have an established relationship with [a P.A.] it's like working with a total stranger. You don't know their abilities or weaknesses or what have you, so [patient-by-patient] presentation is the best way to do it.
> Q. . . . [O]nce you have developed a relationship, how would you handle the way P.A.s -- what's your position with dealing with presentation?
> A. Well, if there's a well-established relationship, which for me is over almost a six-month period to a year of ongoing work together, then as a result of knowing their weaknesses and strengths, you'll say, well, if you have – let's say their weakness is in chest pain or headache patients. Then I'll say you need to present every one of those to me, but if they're just seeing an ankle sprain or what have you, then they can come to me later on and say I saw this ankle sprain, this is what I did; I'm sending them home. So it depends upon the severity of the case and the working relationship we have together.

Q. When you say the prolonged period that you may have known a
P.A. after six months or so and you develop some form of, I would
believe, trust in their ability –
A. Sure. Exactly.
Q. Then you would see the charts of the patient at the end of the
day? What is it you see?
A. If you developed an ongoing relationship with them, then if
there aren't points that you deem weaknesses, like, for example,
the chest pain patient, those you would see each one.
Q. I understand.
A. Whereas if it's their strength, that's their bread and butter and
they're very good at that, then you'll see the charts later on.
Q. After the patient is discharged?
A. In some cases, because obviously you're not going to hold up a
sore throat for three hours.

Epter Depo. at 17-19. According to Dr. Epter, it was a relatively "slow" evening, *i.e.* the number

of patients seen was less than on similar shifts. It was his testimony that he recalled discussing

only two patients with plaintiff during the entire shift. Epter Depo. at 31.

Near the end of the shift, Dr. Epter noted that plaintiff had not "presented" any other

cases to him for his review. There is no dispute that he shared this concern with Ms. Lind, who

set out to find other files reviewed by plaintiff. Later that day, it is not contested, Dr. Epter was

telephoned by Dr. Marshall, the head of the emergency department, and asked to return to the

hospital to review charts which appeared to contain his signature.

After returning to the hospital Dr. Epter met with Ms. Lind and Dr. Marshall. They asked

him to review four charts from the previous shift, signed by the plaintiff, and containing his name

in script on the line designated for physicians' signatures. Dr. Epter denied knowledge of the

charts, claiming that he had not so much as seen, much less signed, them. Dr. Epter also

indicated that the charts revealed serious deficiencies concerning diagnoses, testing, and

treatment. Epter Depo. at 64-65 ("Q. . . . [W]as there anything wrong with the four charts? A.

26

There were parts of the exam missing. There were parts of the history missing. There was a question as to whether or not consultations were actually obtained. There were laboratory results missing. There were whether or not diagnostic studies were performed and their results were not documented, and as you see on the pages that you have, at least, there are not final plans listed on any of the four patients and it is mandatory to have a final plan for a patient . . . . So there were many things that were left to question on these four cases . . . ."). He signed a statement to the effect that he had not previously reviewed or signed the charts. Dr. Epter has characterized the apparent signatures as forgeries:

> [A]t the end of the day the physician is the one with the responsibility, so it's irrespective of whether I've known you for ten years or ten seconds. These are questions that my license is on the line and since they were signed by her, that's complete, complete forgery. That's what it comes down to.

Epter Depo. at 75.

After discussing the charts with Dr. Epter and Ms. Lind, Dr. Marshall met with plaintiff and her union representative. At that time, the plaintiff acknowledged that she had written Dr. Epter's name on the signature line of the charts. The accounts vary, however, in terms of how quick plaintiff was to make the admission. *See, e.g.*, Marshall Depo. at 61 ("I asked her if she had signed the doctor's name in the supervising physician's box at which point initially she didn't respond."). The plaintiff then stated that the P.A.'s had been advised by Dr. Looney that it was permissible to note the name of the attending physician on patient charts. She also stated that other physicians permitted her to write their names on the signature line of the chart. She allegedly identified Dr. Niec as one of the physicians that had instructed her to write her name on the chart. Following a brief break for plaintiff to confer with her union representative in private,

27

Dr. Marshall informed her that she was suspended pending further investigation.

According to defendants, an investigation was promptly conducted. Marshall Depo. at 62 ("We wanted to verify some of Ms. Nicholls' statements including the fact that she had mentioned that other physicians had instructed her to sign their name and that other extenders were also involved in . . . the same practice according to Dr. Looney. So we wanted to talk with Dr. Looney. At which time we – and we also wanted to talk to Dr. Niec and identify or attempt to identify . . . any other chart [where] the doctor's [name] was co-signed, [where] the doctor's name was written on the supervising physician's signature line and the physician did not actually sign off on the case . . . ."). According to the defendants, the investigation revealed that Dr. Looney "had instructed them to *print* the doctor's name on the chart so that the physician could be identified" and that "he did not say that they should *sign* the doctor's name or write the doctor's provider number on that area." Marshall Depo. at 63 (emphasis added).

In addition to speaking with Dr. Looney, a sample of contemporaneous charts were reviewed. Marshall Depo. at 63-64 ("We reviewed approximately 200 charts from around that period of time. We identified two charts from one night that Ms. Nicholls worked with Dr. Niec. We then in reviewing the other 200 or so charts looked at the box for the provider, the box for the supervising physician and in no instance did we notice that it appeared that anybody other than the doctor printed, signed their name and put their provider I.D. number. . . ."). Dr. Daniela Niec was shown the two suspect charts completed by the plaintiff and identified in the investigation; she indicated that the apparent signatures in the physician signature blocks were not hers and that she had not authorized plaintiff to sign for her. After the investigation by Dr. Marshall and Lind, defendants concluded:

28

[I]t appeared that Ms. Nicholls had purposefully signed Dr. Epter's name in the physician signature line on page 2. What this created was a process where the medical record then goes to the clerk. The clerk looks at it. It appears as though there is a signature and a provider number on the record. The record is then put into the process of being coded, processed and sent to medical records.

What happens is in that instance once the chart has been processed then it's in medical records and the doctor has never seen the records, never reviewed the records.

Marshall Depo. at 76.

Dr. Marshall, the African American head of the department, made the decision to terminate plaintiff. She was terminated on September 6, 2002.

Plaintiff's grievance regarding the hospital's action was arbitrated. The arbitrator supported his conclusion in favor of the defendants as follows:

> The essential facts of this matter are not in dispute. The evidence clearly establishes that the grievant wrote in the names of Dr. Epter and Dr. Niec on at least seven medical charts. Neither the Union nor the grievant dispute this fact. In the case of Dr. Epter, the grievant wrote in his name on the signature line of the charts reserved for the signature of the supervising physician. Not only did the grievant write in Dr. Epter's name on his signature line but she also did so in script handwriting rather than in print lettering. Furthermore, she also wrote in Dr. Epter's official provider number. The question, therefore, is whether the grievant intentionally intended to deceive the Hospital by attempting to make it appear that the charts were signed by Dr. Epter.
>
> The Union essentially contends that the grievant's actions were primarily technical errors on her part, for the most part prompted by a misunderstanding of Dr. Looney's instructions permitting a Physician's Assistant to write in the name of the supervising physician on medical charts. The Union argues that the grievant had nothing to gain by filling in Dr. Epter's name on the charts and that there were no consequences from her actions. The Union argues that the nature of the charge against the grievant had little or nothing to do with the quality of medical care she provided to patients [on] the night in question and, in fact, the Hospital did not question the quality of her work that night.

29

Notwithstanding the Union's characterization of the grievant's actions, I do not arrive at the same conclusion. My review of the documents in question persuades me that the grievant was quite careful, in each and every instance, to write Dr. Epter's name on the signature line for the attending physician on the charts at issue. Had the grievant simply misplaced Dr. Epter's name on the chart, I am not convinced that she would have so consistently placed his name on the signature line of the each chart rather than in some instances placing the doctor's name on lines reserved for his printed name. Moreover, her use of script handwriting to write Dr. Epter's name is highly suggestive that the grievant was intent on making it appear that Dr. Epter signed the form himself. Lastly, the grievant's insertion of the doctor's provider number next to his name is in my opinion persuasive indication that the grievant intended to deceive and provide the false impression that Dr. Epter certified the treatment provided the affected patients. The grievant's explanation that somehow she learned that it was necessary for "productivity and location" purposes to insert Dr. Epter's provider number did not ring true to me. I also do not credit the grievant's testimony that she held numerous consultations with Dr. Epter during the shift and that she left the disputed charts with Dr. Epter at the end of her shift. I can see no reason why Dr. Epter would not testify truthfully about what occurred on the date in question. There is simply no indication that Dr. Epter harbored any animus toward the grievant before the incident or that he possessed any reason to dissemble about his conduct that day. Simply put, I found Dr. Epter's testimony considerably more credible than that of the grievant.

I also disagree with the Union that the question in this matter must be confined merely to the narrow issue of whether the grievant placed the name of Dr. Epter on the wrong line of a medical chart. Given the legal and medical implications of an attending physician's signature on a medical chart, I find it problematic to parse out issues of patient care, medical supervision and consultation from the issue of whether and why the grievant may have signed the name of an attending physician on the wrong line of a medical chart. Certainly, the Hospital, in arriving at its decision to terminate the employment of the grievant, did not view the grievant's misconduct in such narrow terms. . . . As an extension of Dr. Epter, the grievant was duty bound to represent the interests of her patient, her supervising physician and the Hospital when administering care to a patient. Any deceit or fraud associated with this responsibility or lack of accountability with

respect to patient care could place herself, the supervising
physician or the Hospital in a precarious legal position, much less
compromise the quality of care a patient might receive by the lack
of oversight from an attending physician.

I am convinced that when the grievant signed Dr. Epter's
name on five medical charts, she did so purposefully with intent to
deceive both Dr. Epter and the Hospital.

Am. Arb. Ass'n Op. and Award (Jan. 30, 2005).

## III. Law

### A. Summary Judgment

Summary judgment is granted if "there is no genuine issue as to any material fact and . . .

the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In

determining whether there is evidence enough to preserve a genuine issue as to any material fact,

the court reviews "all of the evidence in the record. In doing so, however, the court must draw

all reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133,

141 (2000). "[T]he burden is upon the moving party to demonstrate that no genuine issue

respecting any material fact exists." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223

(2d Cir. 1994). On a motion for summary judgment, the court may disregard unsupported

assertions of either party and review the record independently. *See, e.g., Palmieri v. Lynch*, 392

F.3d 73, 83 (2d Cir. 2004) (finding that plaintiff "introduced no evidence in opposing summary

judgment to rebut the record evidence."). "The non-movant cannot escape summary judgment

merely by vaguely asserting the existence of some unspecified disputed material facts . . . or

defeat the motion through mere speculation or conjecture." *Aetna Cas. and Sur. Co. v. Aniero

Concrete Co.*, 404 F.3d 566, 574 (2d Cir. 2005) (internal citations omitted).

> In discrimination cases, the inquiry into whether the plaintiff's sex
> (or race, etc.) caused the conduct at issue often requires an
> assessment of individuals' motivations and state of mind, matters
> that call for a "sparing" use of the summary judgment device
> because of juries' special advantages over judges in this area.
> Nonetheless, an employment discrimination plaintiff faced with a
> properly supported summary judgment motion must do more than
> simply show that there is some metaphysical doubt as to the
> material facts. She must come forth with evidence sufficient to
> allow a reasonable jury to find in her favor. Moreover, factual
> allegations that might otherwise defeat a motion for summary
> judgment will not be permitted to do so when they are made for the
> first time in the plaintiff's affidavit opposing summary judgment
> and that affidavit contradicts her own prior deposition testimony.

*Brown v. Henderson*, 257 F.3d 246, 251-52 (2d Cir. 2001) (internal quotation omitted).

## B. Statutes of Limitations

### 1. Title VII Claims

Pursuant to section 2000e-5(e) of title 42 of the United States Code, "[a]n aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 219 (2d Cir. 2004). "When, as in this case, a plaintiff's allegations of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct." *Id.* at 220.

#### a. Discrete discriminatory acts

Section 2000e-5(e)(1) precludes recovery for *discrete* acts of discrimination or retaliation that occur outside the statutory time period, even if other acts of discrimination occurred within the statutory time period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *see also Patterson v. County of Oneida,* 375 F.3d 206, 220 (2d Cir. 2004).

> Thus, the mere fact that an employee was dismissed within the statutory period cannot be used to "pull in [a] time-barred discriminatory act," for "continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination."

*Id.* at 220 (citing *Morgan*, 536 U.S. at 112-13).

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114. Such acts are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. "The law is clear that termination and promotion claims may not be based on discrete acts falling outside the limitations period." *Petrosino*, 385 F.3d at 220.

### b. Continuing Violation

Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would have been untimely standing alone. *See, e.g.*, *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993). The policy complained of need not be formal where "there have been specific and related instances of discrimination, and the employer has permitted them to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination." *Fitzgerald v. Henderson*, 251 F.3d 345, 362 (2d Cir. 2001).

"Hostile environment claims are different in kind from discrete acts" since "[s]uch claims are based on the cumulative effect of individual acts." *National R.R. Passenger Corp. v.*

33

*Morgan*, 536 U.S. 101, 115 (2002).

> The timely filing provision only requires that a Title VII plaintiff
> file a charge within a certain number of days after the unlawful
> practice happened. It does not matter, for purposes of the statute,
> that some of the acts of the hostile environment fall outside the
> statutory time period. Provided that an act contributing to the
> claim occurs within the filing period, the entire period of the
> hostile environment may be considered by the court for the
> purposes of determining liability.

*Id.*; *see also Petrosino*, 385 F.3d at 220 ("[I]n the case of a hostile work environment claim, the statute of limitations requires that only one . . . act demonstrating the challenged work environment occur within 300 days of filing; once that is shown, a court and jury may consider 'the entire time period of the hostile environment' in determining liability.") (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

For a claim alleging a discriminatory policy or a practice to be timely two factors are required. First, at least one act must fall within the time period, and second, that act must be part of the continuing unlawful employment practice. *See, e.g., Patterson v. County of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (rejecting plaintiff's hostile work environment claim as untimely because although the plaintiff's termination had occurred within the time period, the plaintiff had "proffered no evidence to show that the termination, even if discriminatory, was in furtherance of the alleged practice of racial harassment."); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570-71 & n.6 (2d Cir. 2000) (finding sufficient evidence to support the plaintiff's claim of a hostile work environment but emphasizing that the plaintiff's termination – which the court found to be non-discriminatory – did not constitute support for the claim.).

2. Section 1981 Claims

Congress enacted a catchall four-year statute of limitations for suits arising under federal statutes enacted after December 1, 1990. *See* 28 U.S.C. § 1658. Claims under section 1981 "are subject to the 4-year statute of limitations if they arose under an Act of Congress enacted after that date." *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372 (2004).

As here, the plaintiffs in *Jones* claimed that they were subject to discrimination, wrongful termination and a hostile work environment under section 1981. The Court held that the action arose under portions of section 1981 that were added in 1991 so that the catchall four-year statute of limitations applied. *See id.* at 374.

### 3. State and Municipal Claims

The statute of limitations for claims under state and city anti-discrimination laws is three years. *See Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 307, 461 N.Y.S.2d 232, 239 (1983) ("[T]he institution of civil actions to recover damages for unlawful discriminatory practices . . . is governed by the three-year period of limitations . . . .").

### 4. Defamation Claims

The statute of limitations under state law for defamation claims is one year. N.Y. C.P.L.R. § 215(3).

## C. Merits

### 1. Title VII Claims

#### a. Disparate Treatment

Title VII protects individuals from discriminatory employment practices because of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1)-(2). "*[I]ndividuals* are not subject to liability under Title VII." *Patterson*, 375 F.3d at 221 (citing *Wrighten v. Glowski*, 232

35

F.3d 119, 120 (2d Cir. 2000) (per curiam)) (emphasis added).

Suits under Title VII fall into two basic categories: "single issue motivation cases" and "dual issue motivation cases." *Bickerstaff v. Vassar College*, 196 F.3d 435, 445 (2d Cir. 1999). Single issue motivation cases involve solely the question of whether an impermissible reason motivated the adverse action, while dual issue motivation cases involve "both the issue of whether the plaintiff has proved that an impermissible reason motivated the adverse action and the additional issue of whether the defendant has proved that it would have taken the same action for a permissible reason . . . ." *Id.* (quoting *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997)).

The nature of the case determines the framework under which the Title VII claims are evaluated. If the plaintiff asserts that her case is one of single issue motivation, then her claim is subject to the burden-shifting framework provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which initially imposes a *de minimus* burden of proof on the plaintiff. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) ("While the *prima facie* showing required of a plaintiff in an employment discrimination lawsuit is a very modest one, [defendant's] undisputed evidence of plaintiff's substandard job performance, confirmed by plaintiff's own admissions, preclude[s] his carrying even so minimal a burden.").

According to the *McDonnell Douglas* framework employed in single issue motivation cases, the plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is competent to perform the job or is performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse

36

employment action occurred under circumstances giving rise to an inference of discrimination based on her membership in the protected class. *See McLee*, 109 F.3d at 134; *see also Townsend v. Nassau County Med. Ctr.*, 558 F.2d 117, 121 (2d Cir. 1977) (reversing district court judgment in favor of black female blood bank technician who was disqualified from continuing former position by new requirement of college degree, where district court had found that college degree requirement had disparate impact on blacks, concluding on appeal that there could be no inference of racial discrimination in plaintiff's case, because "the newly promulgated requirements, neutral on their face, were applied to each employee at the blood bank in a uniform and racially neutral manner.").

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to supply a legitimate nondiscriminatory reason for the adverse decision or action. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005). The burden is "one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citation omitted). If the defendant meets its burden of production, the *McDonnell Douglas* framework disappears and the plaintiff must show that "the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Id.* at 143 (citation omitted).

If the plaintiff claims that the case involves dual issue motivation, then the burden-shifting framework outlined in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), is used to evaluate her claim. In the latter framework, the plaintiff may establish a violation if she is able to prove by a preponderance of evidence that a protected characteristic played a motivating factor, though "[d]irect evidence of discrimination is not required . . . ." *Desert Palace, Inc. v. Costa*,

539 U.S. 90, 101-102 (2003). If plaintiff is able to meet her burden, the defendant must prove that it would have taken the same actions in the absence of an impermissible motive. *See, e.g.,* *Raskin v. Wyatt Co.*, 125 F.3d 55, 61 (2d Cir. 1997).

"In the instant matter, while [plaintiff] principally treats this as a single issue motivation case pursuant to *McDonnell Douglas* . . . she does make passing argument for dual issue motivation treatment under *Price Waterhouse* . . . ." *Bickerstaff*, 196 F.3d at 446. Viewing the claim in the light most favorable to the plaintiff, the lower *de minimus* burden illuminates the evidence.

b. Termination

Termination claims under Title VII are subject to the *McDonnell Douglas* framework. In order to make out a *prima facie* case of racial discrimination in the termination of employment in violation of Title VII, a plaintiff is required to adduce some evidence that would permit a factfinder to infer that the termination occurred under circumstances giving rise to an inference of discrimination. *See, e.g., Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) ("[Plaintiff's] race discrimination claim rests on her allegation that the hospital refused to accommodate her disability despite having made job accommodations for two disabled white nurses. There is no dispute that as a black woman who was terminated from her job, [plaintiff] satisfied the first and third elements of her prima facie case, *i.e.*, she is a member of a protected class who suffered an adverse employment action. We need not decide whether she was qualified . . . because [her] claim ultimately fails on the third prong: she did not produce evidence sufficient to support a reasonable inference that her termination was the result of race discrimination.").

Once the plaintiff satisfies the initial, "minimal," burden, *see, e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993), "the burden of production shifts to the employer 'to articulate some legitimate, nondiscriminatory reason for the'" termination, *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996) (quoting *McDonnell Douglas*, 411 U.S. at 802), supported by admissible evidence "which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks*, 509 U.S. at 507 (emphasis in original). If the employer satisfies this burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

> The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate.

*Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (internal quotation omitted).

c. Retaliation

The *McDonnell Douglas* burden-shifting framework applies to claims of retaliation. *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 443 (2d Cir. 1999). According to Title VII it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a).

> In the context of a motion for summary judgment, the plaintiff must first demonstrate a *prima facie* case of retaliation, after which the defendant has the burden of pointing to evidence that there was a legitimate, nonretaliatory reason for the complained of action. If the defendant meets its burden, the plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation.

*Richardson*, 180 F.3d at 443. To establish a *prima facie* case of retaliation, the plaintiff must show: "(1) participation in a protected activity that is known to the defendant, (2) an adverse employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision." *Id.*

### d. Hostile Work Environment

To show that he or she was subject to a hostile work environment in violation of Title VII, a plaintiff must establish:

> (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.

*Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir. 2004) (internal quotation omitted). "Generally, the same standards apply to both race-based and sex-based hostile environment claims." *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 436 n.2 (2d Cir. 1999).

> The first element of a hostile environment claim has both an objective and subjective component: "the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively

perceive that environment to be abusive."

*Petrosino*, 385 F.3d at 221 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

In assessing the atmosphere of the workplace, the circumstances in their entirety control. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993). Relevant factors may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," but "no single factor is required." *Id.* at 23. "Isolated incidents of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores*, 202 F.3d 560, 570 (2d Cir. 2000).

> In order to meet [her] burden [of proving a hostile environment claim], the plaintiff must show more than a few isolated incidents of racial enmity; there must be a steady barrage of opprobrious racial comments; evidence solely of sporadic racial slurs does not suffice.

*Williams v. County of Westchester*, 171 F.3d 98, 100-101 (2d Cir. 1999) (internal quotations omitted). The plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment. *See, e.g., Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997); *Cruz*, 202 F.3d at 571 (concluding that plaintiff had adduced evidence that she and others were subjected to "blatant racial epithets on a regular if not constant basis" and that from this evidence "a jury reasonably might conclude that [the] working environment . . . was hostile to [plaintiff] on the basis of her race.").

A plaintiff must show that he or she was targeted for abusive treatment because of a protected status. *See, e.g., Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)

41

(emphasizing that Title VII prohibits only workplace harassment involving statutorily proscribed forms of discrimination); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile work environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.").

Favorable or equitable treatment of a protected group as a whole does not preclude a Title VII claim by a member of that group. *Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("Under Title VII, a racially balanced work force cannot immunize an employer from liability for specific acts of discrimination. . . . It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group."). Nevertheless, "in the absence of evidence suggesting that a plaintiff's [race] was relevant, the fact that both [white] and [non-white] employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their [race]." *Brown*, 257 F.3d at 254.

2. Section 1981 Claims

> Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 . . . .

*Patterson*, 375 F.3d at 225. The significant differences, for purposes of the instant litigation, are as follows: (1) While Title VII claims are not cognizable against individuals, individuals may be held liable under section 1981 for certain types of discriminatory acts, including those giving rise

42

to a hostile work environment; and (2) Although in certain circumstances a Title VII claim may be established through proof of a defendant's mere negligence, without a showing of discriminatory intent, a plaintiff pursuing a claimed violation of section 1981 must show that the discrimination was intentional. *Id.* at 226.

### 3. State and Municipal Claims

"The procedure for demonstrating . . . race discrimination under the state and city antidiscrimination laws follows the familiar *McDonnell Douglas* order of proof for claims brought under Title VII of the Civil Rights Act of 1964 . . . ." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). *See also Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999) (state law); *Landwehr v. Grey Advertising, Inc.*, 211 A.D.2d 583, 622 N.Y.S.2d 17, 18 (1st Dep't 1995) (city law).

First, plaintiff must establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *Norville*, 196 F.3d at 95. Once the plaintiff has established the *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the employer meets its burden, the plaintiff then must prove that the articulated justification is in fact a pretext for discrimination.

### 4. Defamation Claims

> Defamation is defined as a false statement that exposes a
> person to public contempt, ridicule, aversion or disgrace. A party
> alleging defamation must allege that the statement is false. In
> addition, where the party is a public figure, that party must allege
> that the statement was made with "actual malice," defined as either

> knowledge of the falsehood or recklessness as to the falsehood.
> Where the party alleging defamation is not a public figure, a
> showing of common-law malice, or ill will, is necessary. Even
> though a statement is defamatory, a qualified privilege exists where
> the communication is made to persons who have some common
> interest in the subject matter.

*Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 779 N.E.2d 167, 171 (N.Y. 2002).

"Under New York law, the plaintiff must establish four elements in order to prevail on a defamation claim: (1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by the defendant; and (4) resulting in injury to the plaintiff." *Kforce, Inc. v. Alden Personnel*, 288 F. Supp.2d 513, 516 (S.D.N.Y. 2003); 2 Committee on Pattern Jury Instructions, *New York Pattern Jury Instructions - Civil*, PJI 3:23 (2005) (hereinafter "New York Pattern Jury Instructions") ("To recover damages for slander, plaintiff has the burden of proving three elements. . . . First, plaintiff must prove that the statement was defamatory, meaning that the statement had a tendency to expose the plaintiff to public hatred, contempt, ridicule or disgrace. Second, plaintiff must prove that the statement referred to the plaintiff, meaning that the statement would reasonably be understood to be about the plaintiff. Third, plaintiff must prove that defendant published or broadcast the statement, meaning that *the defendant* communicated the statement to someone other than the plaintiff.") (emphasis added). "A statement that is merely unpleasant, offensive or embarrassing, or that hurts the plaintiff's feelings, is not necessarily defamatory." New York Pattern Jury Instructions, PJI 3:23.

> The gravamen of an action alleging defamation is an injury
> to reputation. The New York Court of Appeals has defined a
> defamatory statement as one that exposes an individual "to public
> hatred, shame, obloquy, contumely, odium, contempt, ridicule,
> aversion, ostracism, degradation, or disgrace, or . . . induce[s] an
> evil opinion of one in the minds of right-thinking persons, and . . .

44

deprives one of . . . confidence and friendly intercourse in society."

*Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (citation omitted).

"Communications between a 'plaintiff's former employer ... [and] the plaintiff's prospective employer cannot support a cause of action to recover damages for defamation' because New York recognizes a 'qualified privilege' with respect to communications between former and prospective employers 'as to the character of a former employee ... even though such information may prove ultimately to be inaccurate.'" *Cellamare v. Millbank, Tweed, Hadley & McCloy LLP*, 2003 WL 22937683, at *9 (E.D.N.Y. Dec. 2, 2003) (citations omitted); *Serratore v. American Port Servs.*, 293 A.D.2d 464, 465-66, 739 N.Y.S.2d 452 (2d Dep't 2002) ("[A] qualified privilege exists for the purpose of permitting a prior employer to give a prospective employer honest information as to the character of a former employee even though such information may prove ultimately to be inaccurate.") (internal quotation omitted).

A qualified privilege "can only be overcome by a showing that the defamatory remarks 'were made with actual malice.'" *Cellamare*, 2003 WL 22937683, at *9. To show actual malice under the common law, a plaintiff must prove spite, ill will, or "such culpable recklessness or gross negligence as constitutes a wanton disregard of the rights of others." *Konowitz v. Archway School, Inc.*, 65 A.D.2d 752, 753, 409 N.Y.S.2d 757 (2d Dept. 1978). The Supreme Court has established an "actual malice" standard consistent with First Amendment principles: "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). In New York, "the constitutional as well as the common-law standard will suffice to defeat a conditional privilege." *Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992).

## 5. *Patterson v. City of Oneida*

The facts of the instant case resemble those in *Patterson v. City of Oneida*, 375 F.3d 206

(2d Cir. 2004). In *Patterson*, a terminated employee appealed from a district court's grant of

summary judgment. It had ruled that: (1) plaintiff's Title VII claims were time-barred; and (2)

plaintiff had failed to proffer evidence sufficient to permit an inference that he had been

subjected to discrimination on the basis of his race. On appeal, plaintiff contended that none of

his claims were time-barred and that he proffered sufficient evidence to show that there were

genuine issues of fact to be tried as to whether he was subjected to a hostile work environment

and was fired because of his race, and whether there existed a department custom, policy, or

practice of racial discrimination. The Court of Appeals affirmed, except to the extent that the

judgment dismissed hostile work environment claims against two individual defendants who,

according to plaintiff, assaulted him by beating him and spraying his eyes with mace while

yelling racially offensive comments. On appeal, defendants had taken the position that "the

macing incident was mere horseplay and that the challenged conduct was not sufficiently severe

to create a hostile work environment . . . ." *Id.* at 231.

For purposes of the law applicable to the instant motion, *Patterson* stands for the

proposition that conclusory observations will not suffice to support either side's position:

> Affidavits submitted in support of or in opposition to [a]
> summary judgment motion must "be made on personal knowledge,
> shall set forth such facts as would be admissible in evidence, and
> shall show affirmatively that the affiant is competent to testify to
> the matters stated therein." The . . . requirement that affidavits be
> made on personal knowledge is not satisfied by assertions made
> "on information and belief." However, a verified pleading, to the
> extent that it makes allegations on the basis of the plaintiff's
> personal knowledge, and not merely on information and belief, has

46

the effect of an affidavit and may be relied upon to oppose summary judgment. Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial. *Nor is a genuine issue created merely by the presentation of assertions that are conclusory.*

375 F.3d at 219 (emphasis added). In *Patterson* the Court of Appeals reiterated Rule 56(e)'s

provision that "[w]hen a motion for summary judgment is made and supported . . . the adverse

party's response . . . must set forth *specific facts* showing that there is a genuine issue for trial."

*Id.* (emphasis in original).

## IV. Application of Law to Facts

A. Statutes of Limitations

    1. Title VII Claims

Plaintiff filed her EEOC charge on July 2, 2003. Under the 300-day basic rule of section

2000e-5 of title 42 of the United States Code, claims based on acts alleged to have occurred

before September 5, 2002 are time-barred.

Plaintiff was terminated on September 6, 2002. Her Title VII claims relating to her

termination are timely. All prior Title VII claims are time-barred, because, assuming she had

proffered evidence to support them, they would constitute discrete acts of discrimination or

retaliation outside the statutory time period. The mere fact that she was dismissed does not "pull

in" the alleged time-barred discriminatory acts. *Patterson*, 375 F.3d at 220.

*Assuming arguendo* that plaintiff had proffered evidence sufficient to set forth a hostile

environment claim, at least one discriminatory act in support of the claim would need to be

timely. Termination is a discrete act and will not serve as evidence of a discriminatory policy or practice and thereby satisfy Title VII's "continuing violation" exception. *See id.*

2. Section 1981 Claims

Claims brought under section 1981 of title 42 of the United States Code need not be asserted within the 300-day period applicable to Title VII claims. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372 (2004) (holding that distinct four-year statute of limitations applied to such claims). The events plaintiff complains of began in May of 2000 and extended – at the very latest – to the last night she worked a shift, in August of 2002. Her complaint was filed on December 10, 2003. Her section 1981 claims are not time-barred.

3. State and Municipal Claims

The statute of limitations for claims under state and city anti-discrimination laws is three years. For the reasons indicated in Part IV.A.2., *supra*, plaintiff's state and city anti-discrimination claims are not time-barred.

4. Defamation Claims

Plaintiff's defamation claims are time-barred. She filed her complaint on December 10, 2003. Pursuant to New York State law there is a one-year statute of limitations for defamation claims. Any claim that arose prior to December 10, 2002 would be time-barred. The meetings and rumors that were alleged to have been percolating through the department occurred in September of 2002. They are time-barred.

With respect to the claims that Brookdale Hospital gave her poor recommendations to prospective employers, plaintiff has been unable to identify any of these alleged contacts; since she cannot identify or prove the dates, the content, the recipient or the publisher of any of her

48

alleged defamatory communications, they should be considered time-barred.

There is no evidence of defamation in the record, either before or after plaintiff's termination. The merits of the claim are addressed below. *See* Part IV.B.3, *infra*.

B. Merits

1. Title VII Claims

In her complaint, plaintiff asserts discrimination, hostile work environment, and retaliation claims against the defendants. Before reaching the substance of plaintiff's Title VII claims, it is important to note that "individuals are not subject to liability under Title VII." *Patterson*, 375 F.3d at 221 (citing *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam)). All Title VII claims against individual defendants are accordingly dismissed on the merits.

Plaintiff endeavors to persuade the court that this summary judgment motion turns on the following details about her termination: (1) Did plaintiff believe she was authorized to write a doctor's name on a particular place on a chart?; (2) Did plaintiff know the difference between printing and signing?; (2) Was plaintiff erroneously terminated rather than suspended?; etc. Significantly, plaintiff has not met her preliminary burden by showing that any of these questions turned on her race, ethnicity, ancestry or national origin. While she has raised questions about office politics, difficult bosses, and the kinds of frustrations that often arise when strangers are forced to work closely together on a daily basis, she has not shown, beyond the introduction of mere conclusory allegations, that such "hostility," amounted to an actionable claim for discrimination, a hostile work environment, or retaliation.

a. Disparate Treatment

49

Plaintiff claims that she was subject to racial discrimination in her assignment of unfavorable work schedules and in her termination. In support of both claims of discrimination, plaintiff relies largely on Ms. Lind's allegedly discriminatory disciplinary and hiring practices. Pl. Aff. ¶¶ 13, 14 ("I believe that race and ethnicity was a factor in LIND's actions. She continued hiring and interviewing nonblack Physician Assistants but disciplined and terminated black Physician Assistants. In addition, Lind hired over a dozen Nurse Practitioner[s], over half of whom were white."); Am. Compl. ¶¶ 21, 22, 32, 33, 34, 68, 70 ("The Hospital's assignment, retention, discipline, and termination policies have had a disparate impact on employees of Plaintiff['s] race, national origin, ethnicity, and/or ancestry. In the past several years, minority representation in the Department has fallen without cause. The change in demographics has coincided with LIND's supervision of the Department. . . . Since LIND's employment . . . the Hospital has wrongfully terminated, demoted, and otherwise adversely disciplined approximately 20 Physician's Assistants of Plaintiff's race, national origin, ethnicity and/or ancestry. LIND, however, continued to hire white Physician's Assistants . . . . *Upon information and belief*, these actions were based at least in part on unlawful discrimination. . . . *Upon information and belief*, another union delegate, DELTA BURKE, also has been suspended and unfairly disciplined. . . . *Upon information and belief*, many of the black and West Indian Physician's Assistants were replaced by nonunionized white or Asian nurse practitioners.") (emphasis added); Barry Slater Aff. ¶ 36 ("[M]any P.A.'s believed that Ms. Lind was purposefully hiring white N.P.s (and residents) with the intent to replace the black P.A.s.").

Plaintiff's Deposition did not support these claims:

> Q. [The complaint] says that, in the time that you were employed

there or in the time since Kathy Lind came to work at Brookdale
Hospital, approximately twenty PA's of Plaintiff's race, national
origin, ethnicity, and/or ancestry were either wrongfully
terminated, demoted or otherwise adversely disciplined. Can you
identify those people for me, those twenty physician's assistants?

A. By name?

Q. Yes.

A. All of them?

Q. Yes.

A. This was over a period of time, I would have to refer to my
notes. I can recall some of them for you, not all of them at this
point.

Q. Well, who can you recall?

A. Wallace Levy, Brenda Wallace Levy, Kernold Alves.

Q. Anyone else?

A. That I can recall at this point, no.

Q. In your complaint, you allege that Kathy Lind was hiring
predominantly white and Asian physician's assistants. Who were
you referring to?

A. That referred to Linder, the three people that she hired, the
other three people.

Q. Who are they?

A. Extenders.

Q. I am asking about physician's assistants.

A. While I was there, Linder is the only physician's assistant that
came on, I do believe.

Q. You are saying, from the time that Kathy Lind came on board
at Brookdale until the time that you were terminated, only one
physician's assistant was hired.

A. I am not so sure about that, I can't say that he was the only one.

Pl. Depo. at 114, 115, 182, 183.

Contrary to plaintiff's conclusory allegations of discriminatory hiring, the hospital has

introduced evidence that during her tenure, Ms. Lind increased the proportion of black (including

those of West Indian descent) P.A.'s. Plaintiff disputes this claim but only through conclusory

statements, calling into question the hospital's statistics, and without reference to particularized

evidence that might support her claim. She has introduced no admissible, non-conclusory

51

evidence to suggest that Ms. Lind's hiring practices were racially discriminatory. *Compare Patterson*, 375 F.3d at 219 ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and *not merely on information and belief*, has the effect of an affidavit and may be relied on to oppose summary judgment. . . . [A] genuine issue [is not] created merely by the presentation of assertions that are conclusory.") (emphasis added).

Plaintiff claims that racial epithets were used. The evidence proffered in regard to any *racial* epithets is inadmissible hearsay and not significantly probative. Plaintiff indicated that she recalled Dr. Niec calling Evelyn Mark a "black bitch" but did not have personal knowledge of the alleged incident. Plaintiff also indicated that she heard Dr. Niec refer to a Hispanic doctor as a "faggot." While such a comment might, given the appropriate circumstances, suggest discrimination based on sexual orientation, it does not support a claim for a *racially* discriminatory workplace. *But see Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005) ("The law is well-settled in this circuit and in all others to have reached the question that . . . Title VII does not prohibit harassment or discrimination because of sexual orientation.") (internal quotation omitted).

The probative force of these two statements is particularly weak since Dr. Niec was not involved in the decision to terminate the plaintiff. *Compare Patterson*, 375 F.3d at 222 ("[W]e see no relevance in [plaintiff's] evidence that in a seven-year period [an individual] use[d] a racial epithet and once [laughed] when a corrections officer did so. Such isolated events over an extended period of time have little intrinsic probative value. Further, [plaintiff] produced no evidence that the decision to terminate his employment was either made or initiated by [that individual]."). Dr. Niec was originally named as a defendant by the plaintiff, but following

discovery, at oral argument, her claim against Dr. Niec was dismissed on consent. June 15, 2005

Hrg. Tr. at 11.

In her deposition testimony, when plaintiff was asked whether *anyone* in the hospital ever

said *anything* derogatory *to her*, she responded:

> A. Kathy Lind. We were having – we wanted to have like a PA
> day and I had approached her about it, and she made mention of – I
> said, you know, we are thinking of ordering ethnic food and stuff
> like that, and then she had made some mention of, "We don't want
> that greasy food." But yet, I felt it was discriminatory, because
> when we had other meetings and they ordered pizza, I saw her
> eating the pizza, so I felt that was discriminatory.

Pl. Depo. at 191. Such expressed food preferences hardly support any of plaintiff's serious

claims.

Plaintiff also introduced evidence, primarily through an affidavit from Barry Slater, that

white hospital employees were given more favorable treatment as compared to black or West

Indian employees who were more likely, in his estimation, to be sanctioned or terminated. Slater

Aff. ¶¶ 43, 45 ("*Upon information and belief,* during my employment in the Department, no

white extender or nurse was terminated while Ms. Lind was Director of Emergency Services. In

contrast, black extenders were regularly disciplined, suspended, and terminated. . . . . Due to

these disparities, the P.A.s protested the employment of the N.P.s because we believed that Ms.

Lind wanted to replace us and that discrimination was a factor.") (emphasis added).

These beliefs of Slater, like plaintiff's own deposition testimony – which was vaguest and

spottiest when addressed to questions of race, ethnicity, ancestry and national origin

discrimination – are subjective conclusory assertions without evidentiary support. *Compare*

*Patterson v. County of Oneida,* 375 F.3d 206, 223 (2004) ("The Brown affidavit, for example,

made the conclusory assertion that Brown was 'personally aware of numerous instances in which White deputies were charged with similar or more egregious acts and were never suspended 'pending investigation,' with or without pay, even after guilty pleas and disposition of their charges;' but no 'specific facts' as required by Rule 56(e), were provided. The Brown affidavit also gave the names of six deputies, '5 of whom' were said to have 'verified to [Brown]' that they had been charged with DWI but not disciplined; but the assertion by Brown that other persons made such 'verifi[cations],' was further hearsay."). The unsatisfactory Brown affidavit in *Patterson* could be said to mirror the Slater affidavit in the instant action, which set forth a series of conclusory allegations -- including a list of names of individuals who were alleged to have been wrongfully disciplined or terminated on the basis of illegal discrimination – that found no support in the record.

(i) Scheduling

Plaintiff claims that she was discriminated against in her scheduling. Pl. Aff. ¶ 15 ("LIND created a self-scheduling system through which she could suspend seniority preferences. LIND granted preferred scheduling and clinical assignments to white Physician Assistants without regard to the self-scheduling system."); Pl. Depo. at 240-41. ("The white staff that we had were allowed to have preferential – were given preferential treatment. In terms of scheduling they were given permanent shifts. I was forced to work in the high risk area even though the master schedule had me to work a particular area. By the time I got the weekly schedule they had placed me to work in . . . that GYN Team B area, which is, carries great liability. Even sometimes, even if I'm in Fast Track, I'm being pulled from Fast Track and placed over in that area while people like Perduk, Ken Levenstein (phonetic), who are white, they had set days and

set shifts and set places where they did their shifts.").

Though plaintiff claims to "ha[ve] pled both pretext- and mixed-motive cases and [claims she] can satisfy her burdens," Pl.'s Mot. Opp. Def's Mot. Summ. Judg. at 12, and while she has established the first two of the four elements of a *prima facie* case of discrimination – (1. membership in a protected class; 2. qualification for the job position; 3. adverse employment action; and 4. a causal inference of discrimination) – she has not established the last two prongs.

Plaintiff has not established that the scheduling changes consisted of fewer overtime opportunities, a diminution of prestige, or otherwise objectionable duties, constituting adverse employment action. An adverse employment action is one which prompts a "materially adverse change in the terms and conditions of employment." *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 446 (2d Cir.1999). To be "materially adverse" a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)).

Plaintiff complains that she was disproportionately assigned to work in obstetrics/gynecology (Team B–GYN), which, she claims, is "an undesirable clinical assignment." Pl.'s Mot. Opp. Defs' Mot. Summ. Judg. 14. She asserts, but does not explain why the assignment is "materially adverse." *Id.* In his affidavit, Barry Slater explains that the shift was undesirable because "the doctors tended to shift responsibility for Team B – GYN to the physician extenders, [i.e. the physician assistants and the nurse practitioners,]" Slater Aff. ¶ 55, and that therefore the shifts were meant to be shared equally. Such a shift in responsibility constitutes simply an "alteration of job responsibilities" and not an adverse employment action.

55

*Compare Galabya*, 202 F.3d at 640. *See also* June 15, 2005 Hrg. Tr. at 9 ("Plaintiff has conceded that other white physician assistants had similar scheduling inconveniences and that other black West Indian physician assistants did not have similar scheduling inconveniences. Plaintiff also admits in her deposition that she had requested to work the night shift and that is, indeed, the shift that she worked. So, she has not been able to come forward with any evidence that shows that she suffered an adverse employment action with respect to her pre-termination claims. . . . The only qualifying adverse employment action that plaintiff has pled is her termination . . . .").

Even assuming that plaintiff were able to show that she was subjected to a materially adverse employment decision, based on her claim that she was scheduled to work Thanksgiving, Christmas, and New Year's, she has failed satisfy the fourth element necessary to make out a *prima facie* case of discrimination – a causal connection to illegal discrimination. To that end, she claims that:

> [a]nimus can be inferred from language or conduct. In this case, Plaintiff and other Physician Assistants complained of bias, animus, and unfair treatment. A causal nexus may be established through indirect means such as disparate treatment for similarly situated employees. Here, Plaintiff and witnesses assert that white Physician Assistants were given preferential work shifts and clinical rotations. These material factual disputes prevent a grant of Defendants' summary judgment motion.

Pl.'s Mot. Opp. Def's Mot. Summ. Judg. at 15.

Though plaintiff appears to proffer some evidence of "bias" and "unfair treatment," when that evidence is examined, it speaks to professionally based office policy, particularly the replacement of a group of employees (P.A.'s) with a differently skilled group (N.P.'s), and not to

racial discrimination. *See, e.g.*, Pl. Depo. at 126-27 (discussing P.A.'s complaints in the department, which included "salary," "overtime," "sick time," "holiday time," and "scheduling."); Jean Allick Aff. ¶ 56 ("The Physician Assistants felt threatened by this because Ms. Lind was also a Nurse Practitioner and *we* (the Physician Assistants) *felt that there was a possibility of Nurse Practitioners replacing Physician Assistants.* Race was never an issue for me. *Even before Nurse Practitioners were hired under Ms. Lind* Emergency Medicine Residents started rotating through the emergency room and that also became concerning to us. Physician Assistants also feared that residents would eventually replace us. The fact that residents were white was not a problem for me, *I was more concerned that I might be replaced by a resident.*") (emphasis added).

Assuming that plaintiff established a *prima facie* case of discrimination, defendants have offered a legitimate, nondiscriminatory explanation. The P.A.'s self-scheduled, with a P.A., not Ms. Lind, primarily supervising the development of the schedule. While Ms. Lind had ultimate authority, she did not mastermind the scheduling on the basis of impermissible factors, because it was primarily within the control of the individuals choosing their own schedules.

Plaintiff worked in a majority black department. At best she has raised a question as to whether Ms. Lind was a difficult supervisor.

### (ii) Termination

In order to survive summary judgment on her Title VII termination claim, plaintiff must satisfy the first steps of the *McDonnell Douglas* framework. She has satisfied the first two elements. As a black woman from Barbados, she is a member of a protected class. She held her position for nine years, and three months before she was terminated, plaintiff received a

satisfactory performance review. Defs' 56.1 Statement ¶ 10. It can thus be concluded that she was qualified for her position. Her claim of discriminatory termination satisfies the third element, that she was subject to an adverse employment action. *See, e.g., Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).

To satisfy the fourth element, that the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on her membership in the protected class, plaintiff claims that she and "other Physician Assistants complained of bias, animus and unfair treatment," and that she and other witnesses claim that "white Physician Assistants were given preferential work shifts and clinical rotations." Pl's Mot. and Opp. Defs' Mot. Summ. Judg. 15. Support for this assertion comes almost entirely from the affidavit of Barry Slater, who claims that "newer, white employees received preferential treatment in assignments." Barry Slater Aff. ¶ 62. This statement is ambiguous, because it is unclear whether it was the newer employees, the white ones, or the N.P.'s who were given special treatment. It is also conclusory. Slater does give an account of Lind's hiring record, stating that she hired predominantly white candidates, whereas he found that most of the candidates he interviewed were non-white; it is again worth noting that apart from his own unsupported allegations, the record is clear that Barry Slater had no hiring authority. For the sake of evaluating whether there was an impermissible basis for the termination, such a hiring record – were it not explicitly disproved by defendants' evidence and Barry Slater's own acknowledgment that ten of fourteen N.P.'s hired were black West Indians – "could be viewed as reflecting a discriminatory animus." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). *See also* Slater Aff. ¶¶ 37-42. Since plaintiff's burden is *de minimus*, the court will assume the plaintiff has satisfied

58

the fourth element of the test in alleging a discriminationatory termination.

Defendants have satisfied their burden of providing a nondiscriminatory reason for termination. They claim that plaintiff was terminated for having falsified doctors' signatures on medical charts.

Plaintiff has not established a basis for asserting that this reason was merely a pretext for a discriminatory motive to terminate her. The evidence supports the conclusion that her termination was a legitimate, non-discriminatory decision, and that up until the discovery of her egregious mishandling of these documents, she was a valued employee. *See, e.g.*, Pl. June 13, 2002 Performance Eval. (containing notation by Ms. Lind of "overall satisfactory" and notation by plaintiff of "Generally speaking it was a great meeting."); *see also Patterson*, 375 F.3d at 223 (indicating that defendants had provided evidence that plaintiff's termination was the result of "specified conduct that was antithetical to the interests of [defendants' enterprise]"). A copy of one of the relevant documents is attached, with necessary redactions:




U: 1130696          41682103



DOB: 12/25/1977  24  08/28/2002  ERGY

F

| ☐ ATTENDING NOTE | ☐ PROGRESS NOTE | ☐ PROCEDURE NOTE | ☐ OTHER |
|---|---|---|---|

TIME:                    DATE:

## Attending Physician Linkage Statement

I saw and examined the patient with the NP/Resident/Fellow/PA and agree with the history, physical examination, assessment and plan as documented in the note by: _____

## Briefly, the history is: _____

_____

Review of systems is as documented in the NP/Resident/PA note and is otherwise Negative. The PFSH is as documented by the NP/Resident/PA.

## On physical examination I find: _____

_____

## Re-evaluation findings: _____

_____

DEFENDANT'S EXHIBIT L
11·11·04

**Final Diagnosis:** ① Ovarian Cyst

**Final Plan:**

### DISPOSITION

| DIAGNOSIS | CODE | ADMISSION |
|---|---|---|
| 1. ① Ovarian Cyst | / / / | DATE:        TIME:        SERVICE: |
| 2. | / / / | ATTENDING PT ADMITTED TO: |
| 3. | / / / | TEAM PT. ADMITTED TO: |
| 4. | / / / | UNIT: |

### DISCHARGE

DATE: 8/24/02   TIME:

CONDITION: ☐ IMPROVED ☒ STABLE

☒ TREAT & RELEASE

☐ AMA

☐ WALK OUT (SEE WALK OUT FORM)

☐ EXPIRATION

### TRANSFER (SEE TRANSFER FORM)

DATE:        TIME:

REASON FOR TRANSFER:

FACILITY:

ACCEPTING PHYSICIAN:

MODE OF TRANSPORT   ☐ ALS   ☐ BLS   ☐ OTHER

### PROVIDER

PRINT: Alicia Nicholls PA

SIGNATURE: Alicia Nicholls PA

PROVIDER NO.: 5N31

### SUPERVISING PHYSICIAN

PRINT:

SIGNATURE: Dr Cepler

PROVIDER NO

The fact that Dr. Marshall, who made the ultimate decision to terminate plaintiff, was himself a black African American (not a West Indian), serves to support defendants' claim that plaintiff's termination was not based on impermissible motives. *See, e.g.*, *Zeigler v. Marriott Int'l, Inc.*, 2005 WL 1022431, at *15 (S.D.N.Y. May 2, 2005) (granting summary judgment against plaintiff based in part on the fact that since one of the managers involved in the termination was black, plaintiff had not "established even a *prima facie* case with respect to disparate treatment in termination"); *Sykes v. Mt. Sinai Med. Ctr.*, 967 F. Supp. 791, 797 (S.D.N.Y. 1997) (granting summary judgment against African American plaintiff where "defendant ha[d] introduced enough evidence . . . to make it impossible to raise a genuine issue of material fact simply by relying on the fact that [different] employees were not given the same discipline. This is especially so when the person making the decision to terminate plaintiff . . . was himself an African-American.").

b. Hostile Work Environment

Plaintiff alleges that "[f]rom the evidentiary record, a jury can find that Plaintiff was subjected to a hostile work environment. She was targeted for heightened scrutiny and was excessively disciplined." Pl.'s Mot. Opp. Def's Mot. Summ. Judg. at 18.

She has failed to provide details regarding the instances she claims constituted such treatment. While Plaintiff need not provide a list of particular instances, *Torres v. Pisano*, 116 F3d 625, 631 (2d Cir. 1997), the standard for summary judgment requires more than conclusory allegations, speculation, or conjecture. *See Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990).

The record, viewed in the light most favorable to the plaintiff, suggests that plaintiff's

assignment of unfavorable shifts and other alleged discriminatory treatment were neither

sufficiently continuous nor severe as to amount to a hostile work environment. Plaintiff has

failed to identify the frequency of the unfavorable assignments necessary to determine whether

this treatment created an environment that a reasonable person could find to be hostile. A proper

assessment of "all the circumstances" can only be undertaken if plaintiff explains what acts she

takes to constitute "heightened scrutiny," "discrimination," and "disparate discipline."

Plaintiff has failed to show that she was targeted for abusive treatment because of her

protected status. *See, e.g., Brown v. Henderson*, 257 F.3d 246, 252 (2001); Brenda Lee Aff. at

35-36 ("[P]eople think of discrimination in all forms. I get complaints of discrimination,

complaints because of a shift change, complaints because they don't get a schedule they want,

they think it's discrimination. I get complaints, people would say they call everything

discrimination, it's not necessarily a basis for a complaint."). Plaintiff's allegations about Ms.

Lind's discriminatory hiring practices, along with evidence of a single racial epithet of which she

has no personal knowledge, do not suffice to establish discriminatory intent where it is clear from

the record that Ms. Lind's hiring practices were not discriminatory, she herself used no racial

slurs, and the scheduling system she put in place allowed individuals to help designate their own

schedules on a race-neutral basis. Plaintiff's claim that Ms. Lind made a discriminatory

comment to her in saying she did not want to order greasy food, allegedly referring to "ethnic"

food, is, in context, frivolous.

As in *Patterson*, the plaintiff in the instant case primarily sought to support her assertion

that the termination of her employment was part of a racially discriminatory policy with the

affidavit of a single person – Barry Slater. Like the affidavit in *Patterson*, however,

> [the] statement that the [Hospital] had such a custom, practice and
> policy is entirely conclusory. Such conclusory allegations, which
> appear in other submissions by [plaintiff] as well, are insufficient
> to support the proposition advanced to show the existence of a
> genuine issue to be tried.

375 F.3d at 222.

### c. Retaliation

In order to satisfy the first step of the *McDonnell Douglas* test and establish a *prima facie* case of retaliation, the plaintiff must demonstrate: "(1) participation in a protected activity that is known to the defendant; (2) an adverse employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse employment action." *Richardson*, 180 F.3d at 443. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).

Plaintiff's retaliation claim can be examined in a fashion similar to her termination claim, with one significant difference. She has not shown that she brought claims of discrimination based on race or gender to the attention of the hospital administration. Plaintiff has proffered evidence of complaints based on scheduling, overtime, etc., but not once has plaintiff pointed to an instance where she brought a claim and indicated that it was based on race or gender. *See* June 15, 2005 Hrg. Tr. at 12-13. To the contrary, the plaintiff has acknowledged that she did not even formally report the "black bitch" comment which is central to her case; she indicates that she may have forwarded it to the union, but not in writing, and that it was not her job to do more. There is no evidence that the union felt the matter important enough to initiate a grievance.

Even assuming she had met her burden and established a *prima facie* case of retaliation,

63

with regard to her termination, defendants have identified a legitimate, nondiscriminatory reason for termination. Plaintiff has failed to demonstrate that the legitimate, nondiscriminatory reason provided – that plaintiff knowingly falsified hospital records in a manner that gave the impression that patients' charts had been signed by supervising attending physicians – is a pretext for the complained-of discrimination.

2. Section 1981, New York State, and New York City Claims

Title VII claims, section 1981 claims, New York State Human Rights Law claims, and New York City Human Rights Law claims are generally analyzed simultaneously since they require nearly identical legal analysis. *See, e.g., Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000). For the same reasons that plaintiff's Title VII claims lack merit, her section 1981 claims, along with her city and state claims, fail.

3. Defamation Claims

Plaintiff has not proffered a single piece of evidence in support of her claims of defamation:

> Q. Do you know if [Prison Health Services] contacted Brookdale Hospital, do you have any reason to believe that they contacted Brookdale Hospital?
> . . . .
> A. I assume they did.
> Q. What is the basis for your assumption that they did?
> A. Because applications we have to list prior affiliates. And that was one of the affiliates I had.
> Q. Do you have any reason to believe that Brookdale Hospital gave you a bad recommendation to Prison Health Services?
> . . . .
> A. I wouldn't know.
> Q. Do you have any reason to believe that they did?
> A. I don't believe I do.
> Q. When you applied for a position with Dr. Winston Price, did

you fill out an employment application?

A. I don't recall.

Q. Did you ever make Dr. Winston Price aware of the fact that you had worked at Brookdale Hospital?

A. I don't recall.

Q. Do you have any reason to believe that Brookdale Hospital gave a bad recommendation with respect to you to Dr. Winston Price?

A. I don't know.

Q. When you started working for Ocean View Medical Center, did you fill out an employment application?

A. Did I? I think I did.

Q. Do you recall if you listed Brookdale Hospital as a former employer on that employment application?

A. I don't recall if I listed it. I know we spoke of it.

. . . .

Q. Do you have any reason to believe that Ocean View Medical Center contacted Brookdale Hospital or vice versa with respect to your employment there?

A. I believe they did.

Q. What is the basis for your belief . . . ?

A. Because I was working for them and one day they just told me, after, they told me, you know, that they didn't need me anymore and somebody was already in the position?

. . . .

Q. What leads you to believe that [your employer] contacted Brookdale Medical Center?

A. Well, what leads me to believe that he contacted Brookdale? Because I was working there and everything was fine. And just was something like sudden, no notice or anything like that, and –

. . . .

Q. Do you believe that Kings County Hospital contacted Brookdale Hospital regarding your possible employment at Kings County?

A. I believe they did.

Q. Is it also your belief that Brookdale gave you a bad recommendation with Kings County?

A. Yes.

Q. What do you base the belief on?

A. At the time there were some allegations made that I would never work in the State of New York again.

Q. By who?

A. Kathy Lind.

Q. Did Miss Lind say this to you?

A. No.

Q. How do you know Miss Lind made these allegations or made these statements?

A. Because she made [them to] other people who were still employed.

Q. To whom did she make these statements?

A. The people are still working for the hospital and I would not like to mention their names.

. . . .

A. I would like to say that some of the people who I would like to mention would be like Judith Nicholls and Barry Slater, who were employed at the time.

Q. Anyone else?

A. Not that I can recall offhand.

. . . .

A. No, that's not the only people. But those are the people that I can recall offhand. Did you use that word, only?

. . . .

Q. Do you believe that Brookdale Hospital gave you a bad recommendation to Downstate?

A. Yes, I believe they verbally gave me a bad recommendation.

A. What is the basis for your belief that you were given a poor recommendation?

Q. Because of what was happening at the time.

. . . .

A. I'm talking about all the talk that was going around and stuff like that, about the incident that happened with Brookdale.

. . . .

A. Well, it's just my belief that they told them.

Pl. Depo. at 32-50. In addition to these and other claims regarding her efforts to obtain

employment, and her impressions that she was given unfavorable recommendations, plaintiff

claims that a meeting was held after her termination to discuss her termination. Pl. Depo. at 63-

64 ("I felt that – I felt that my – I felt that confidential information about my termination or

events surrounding my termination was privy to too many people, and as a result, as a result,

people were influenced by what was said without, you know, me having a chance to explain

myself. I didn't think it was supposed to be public knowledge that my termination with Brookdale, I felt that it should have been more confidential. It should have been handled a little bit differently.").

Plaintiff's defamation claims are entirely conclusory. Assuming that she could prove that the hospital gave her bad references or indicated that she had forged documents, such statements are protected. Given that the basis for her termination appears well-founded, they would have been defensible as true. Assuming there were evidence that a meeting was held by hospital management to discuss plaintiff's termination with the staff, the hospital was entitled to indicate to its employees the importance of properly documenting patient records, and as a deterrent, to suggest that the falsification of such records would result in termination.

Plaintiff has not proffered evidence that a defamatory act occurred within the one-year statute of limitations period. Her claim would in any event likely be time-barred.

C. Summary Rejection of Like Claim by Court of Appeals

This case in its issue closely resembles *Townsend v. Nassau County Med. Ctr.*, 558 F.2d 117, 121 (2d Cir. 1977). In *Townsend*, a medical professional perceived that members of her class were being replaced by a group of employees with more formal training, and that the new education requirements had an impermissible disparate racial impact. The district court found that the record supported her discrimination claim. *Townsend v. Nassau County Med. Ctr.*, 1975 WL 321 (E.D.N.Y.). The Court of Appeals concluded that an institution – particularly in the medical arena – was entitled to make the qualification requirements for its employees more rigorous, even if it meant that more whites would be hired and promoted than blacks:

> The requirement of a college degree, particularly in the sciences,

> seems to be in the modern day of advanced scientific method, a
> neutral requirement for the protection of the public. No doubt such
> a requirement could serve as a pretext for racial or sex
> discrimination, but this consequence should not be assumed. There
> will be time, if a showing of racial impact is made, for the
> comparison of the requirement of a degree in medicine, law,
> engineering or other professions with such a requirement for a
> laboratory technologist who is required by her Civil Service Title
> to be skillful in clinical chemistry, microbiology, blood-banking,
> serology, and hematology in more than one laboratory. The relative
> function of the academic prerequisites to job-relatedness varies
> inversely with the risk to the health and safety of the public who
> depend upon the technology.

558 F.2d at 120.

The instant case is even stronger than *Townsend*. There is no evidence – apart from

subjective speculation – to suggest that the hiring of N.P.'s had a disparate impact on a protected

class of P.A.'s. The record is clear that ten of the fourteen N.P.'s hired were black individuals of

West Indian descent. Plaintiff's claim lacks all footing, particularly where her termination was

the result of an alleged violation of professional standards – which threatened the very policy

concerns at issue in *Townsend* – by placing the health and safety of the public at risk.

The record, including pleadings, depositions, answers to interrogatories, and admissions

on file, together with affidavits, shows that there is no genuine issue as to any material fact and

that the defendants are entitled to judgment as a matter of law.

It has been established beyond doubt that plaintiff: (1) was fired because she violated a

serious rule designed to protect patients; (2) was never subjected to actionable discrimination

while employed at Brookdale Hospital; and (3) was not defamed.

## V. Conclusion

The defendants' motion for summary judgment is granted. Plaintiff's motions for

spoliation, to strike defendants' Rule 56.1 Statement, and for consolidation of this action with *Mark v. Brookdale Hosp.*, 04-CV-2496, for trial, are denied. Plaintiff's cross-motion for summary judgment is denied. All of plaintiff's claims against the defendants are dismissed with prejudice.

No costs or disbursements.

SO ORDERED.

_____

Jack B. Weinstein

Dated: June 22, 2005
Brooklyn, New York